UNITED STATES, Appellee

v

NATHAN D. PORTER, Recruit,
U. S. Army, Appellant

10 USCMA 427, 27 CMR 501

Captain James A. Hagan argued the cause for Appellant, Accused. With him on the brief was Major Edward Fenig.

First Lieutenant Paul R. Walsh argued the cause for Appellee, United States. With him on the brief were Lieutenant Colonel James G. McConaughy and Major Thomas J. Nichols.

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

Brought to trial before a general court-martial, the accused entered a plea of guilty to a charge of escape from the post stockade on July 6, 1958, and a plea of not guilty to a specification of attempted escape on July 28, 1958. He was convicted of both charges and sentenced to a dishonorable discharge, total forfeiture, and confinement at hard labor for two years. The convening authority approved the conviction, and the board of review affirmed that action, but reduced the period of confinement to one year.

On this appeal, the accused contends he was prejudiced by the law officer's ruling and trial counsel's arguments on certain evidence relating to the attempted escape charge. The circumstances giving rise to the assignment of error are as follows. The accused was confined in the Center Stockade, Fort Stewart, Georgia. Two wire fences separated by about twelve feet surrounded the stockade. The inside fence was between six and seven feet in height, depending upon the terrain, while the outside fence was nine feet high. Both fences had a barbed wire extension of about one foot on the top. At about 9:00 a. m., on July 28, 1958, Sergeant Brown who was standing at the compound gate observed the accused, and prisoners DeShazo and Enderton, lined up on a road inside the compound. One was on one side of the road; another was in the middle; and

the third as on the opposite side of the road. From their position Sergeant Brown thought they were "going to police up, and . . . didn't pay too much attention" to them. He turned around to speak to someone. When he faced back into the compound he saw "three people running toward the fence." It appeared to him that "one man was behind the other." He told the gate guard to go "around by the side" and try to stop them. The prisoners climbed the first fence. According to Sergeant Brown, DeShazo cleared the second fence, Enderton reached the top of that fence, but seemed to be having trouble with the barbed wire. From Brown's angle of vision the accused appeared to be "directly behind Enderton" and "approximately half way up" the second fence. Brown said he "hadn't seen anything like it . . . I mean, people going over the way the men went over the fence." At that point there was rifle fire. Enderton "jumped to the ground" on the outside of the fence, but the accused "fell back in between the fences."

The accused testified in his own behalf. He denied that he intended to escape. He said that he had been relieved of his job in the mess hall and detailed to accompany Enderton, who was suffering from "nervous spells." At the time of his assignment, he was informed by a sergeant that if "anything happened" to Enderton he would be "held responsible for his actions."

**429**

On the morning of the attempted escape he maintained that he tried to stop Enderton. He testified he jumped from the inner fence to the outer and caught Enderton's foot, but was kicked or shaken loose. He fell to the ground just as the firing started. When the shooting stopped he got up and walked to the main gate.

To corroborate the accused's testimony, the defense called a number of witnesses. Lieutenant Rowland, the confinement officer, testified that the accused was taken off his job as cook and told "to look out for" Enderton; thereafter, the accused "more or less appoint [ed] himself as a watch guard for Enderton." The Lieutenant also testified that it was possible for a person "standing upon the lower fence" to push off "with a great deal of force and land almost up against the second fence." Enderton testified that the accused knew nothing of his plan with DeShazo to escape and that the accused tried to stop him from going over the outer fence, but he kicked himself loose. DeShazo said the accused called to Enderton to stop. Other prisoners testified, in substance, that the accused "grabbed" Enderton and tried to pull him back, but Enderton kicked himself loose and went over the outer fence.

In an attempt to discredit the defense version of the incident, trial counsel determined by cross-examination of the accused that he went over the first fence at "just about the place" that Enderton did. He then called Lieutenant Rowland as a rebuttal witness for the Government. The Lieutenant testified that about an hour and a half after the incident he examined an area between the two fences and found three sets of footprints in the sand. They were rather deep, of different size, and about five feet apart. On cross-examination, the witness admitted he had not seen the escape and his only knowledge of the place at which it occurred was "what someone" had told him. Defense counsel then moved to strike the testimony about the footprints because it was connected to the accused only by hearsay.

**430**

The law officer ruled that the evidence would be accepted "subject to the footprints being connected to the accused." He pointed out to trial counsel that the evidence was "only connected by hearsay." When trial counsel completed his examination of the witness, defense counsel renewed his objection. The following colloquy took place:

"DC: In other words, you are . . . May I state my opinion of your ruling? You are then ruling that this is being provisionally accepted subject to connecting up, *and it is not now presently admissible.*

"LO: That is correct.

"TC: Sir, I request that it now be admitted before the court insomuch as we have had two, at least, competent witnesses, Specialist Bell and Sergeant Brown, who have testified that they saw three prisoners go over the fence approximately an hour and a half before Lt Rowland's examination in that one and only general area which is not possible to measure by feet. But the entire area, according to Lt Rowland, was examined.

"LO: Well, I don't recall you asking them the distance from Tower Number 2. Perhaps you did. Did you establish the approximate distance from Tower Number 2 that the people went over on the same date and time?

"TC: To my recollection, they went to the corner they claim in their testimony, although I am not positive. I can establish that later. Excuse me. I withdraw my request."

Lieutenant Rowland was questioned by defense counsel, and by several members of the court, about various aspects of his footprint testimony. After several other Government rebuttal witnesses testified on other matters, the prosecution rested. Defense counsel again renewed his objection to the testimony about the footprints. Trial counsel argued that he had established a sufficient connection, but the law officer ruled that there was "no evidence

sufficiently connecting the footprints with the spot that the people went over the fence." He added that unless the prosecution presented other evidence, "then the evidence [of the footprints] will not be admitted." Trial counsel remarked that he would not "bother to do that" and in fact offered no other evidence on the matter. The law officer then said: "I will make my ruling at the conclusion of the evidence when both sides have rested. It is possible the court might want to know something about it if the prosecution doesn't want to worry about it." Counsel proceeded with their final arguments. In the course of his closing argument, trial counsel referred to the footprints as evidence supporting the Government's case. The law officer instructed the court-martial in detail on appropriate principles of law but he made no mention of the footprint evidence.

The board of review below held that as a result of the law officer's actions the court-martial had no clear "directive" as to whether they could consider the footprint evidence. The board of review assumed the court-martial considered the evidence, but it held that if the consideration was erroneous the accused's "story" was incredible and, consequently, he was not prejudiced by the error. We reach a different conclusion.

Defense counsel's statement of the effect of the law officer's initial ruling, which was specifically concurred in by the law officer, clearly shows that the footprint testimony was not to be considered by the court-martial. Consequently, trial counsel erred in arguing that the evidence supported the Government's position. Also the law officer erred in failing to instruct the court-martial to disregard it. In our opinion, these errors prejudiced the accused.

The board of review characterized the accused's testimony as incredible. The characterization disregards the very substantial corroboration the accused received from Enderton and DeShazo and a number of other defense witnesses. It also disregards Lieutenant Rowland's testimony about the possibility of jumping from one fence to the other and the testimony of the defense witness who said he actually saw the accused jump from one fence to the other and that it appeared to him the accused might have "grab[bed] Enderton's pants leg or pants." True the court-martial could have disbelieved all the defense testimony, but it cannot be described as incredible or unworthy of belief as a matter of law. In our opinion, there was a real risk that the footprint evidence influenced the court-martial in its deliberations on the accused's guilt or innocence.

In view of our conclusion on the first issue, it is unnecessary to consider the accused's second assignment of error which relates to the law officer's instruction on reasonable doubt.

The findings of guilty of the Additional Charge and its specification and the sentence are set aside. The record of trial is returned to The Judge Advocate General for submission to the board of review. In its discretion, the board of review can dismiss the Additional Charge and reassess the sentence on the remaining findings of guilty, or order a rehearing on the charge and the sentence.

Judge FERGUSON concurs.

LATIMER, Judge (dissenting):

I dissent.

I

I am unable to follow the reasoning of my brothers that accused was prejudiced by any one or any combination of the asserted irregularities. When all is said and done, we need be concerned with only one question, namely, was the testimony admissible? If it was, all other asserted errors fail. If it was not, then the subsidiary question of prejudice must be considered. Significantly, the principal opinion does not discuss that question but goes off on inconsistent and secondary grounds

which are irrelevant if the footprints were connected with the accused. To make my point clear, I analyze my associates' approach. If, as they contend, "Defense counsel's statement of the effect of the law officer's initial ruling . . . clearly shows that the footprint testimony was not to be considered by the court-martial," I am certain the court-martial members would not be misled into believing otherwise. Therefore, to be consistent with their conclusion, my colleagues cannot predicate their reversal on the erroneous admission of evidence. They assert, however, that the law officer erred by failing to instruct the court to disregard the footprint testimony. Any such omission would be of no consequence if the court understood the evidence was not to be considered, but in all events the validity of that conclusion depends upon the admissibility of the evidence. If, as I shall later demonstrate, the testimony was properly before the court, then obviously reversal cannot be predicated upon the law officer's failure to sustain the motion to strike. And certainly this is true even though he might have mistakenly believed the evidence inadmissible. Finally, the majority look to another reed for support, and it is indeed a weak one. They contend trial counsel erred by referring to the footprints in his closing argument as evidence supporting the Government's case. In answer to that contention, I merely say his argument was proper if the evidence—whether rightly or wrongly—was in the record. He should not be tarred for predicating his argument on matters before the court-martial.

As the principal opinion points out, the law officer indicated his belief that the footprint evidence had not been connected with the accused, but deferred ruling on the defense motion to strike. And after both parties had rested, he, along with the other trial participants, apparently either forgot the matter or considered it of no importance, for no one mentioned it and no action was taken. In my view, there can be no question but that the law officer should have ruled with finality on the motion. And if he had ruled properly, he would

**432**

have denied the motion. But, as I have previously pointed out, under my associates' construction of the law officer's ruling, it would follow that the evidence was not before the court-martial. Under that reasoning, the error in vacillating would be unimportant except as it may have contributed to trial counsel's comment. It is only when I treat the evidence as having been erroneously admitted by the law officer that I find the slightest possibility accused suffered any harm, and that leads me to the undeveloped aspect of this case.

## II

From this record, there can be no doubt that the testimony was admissible. Contrary to the implication that Lieutenant Rowland offered nothing more than hearsay testimony to connect the footprints with accused, clearly such is not the case. It had been otherwise established that the three prisoners scaled the first fence and proceeded to the outside enclosure near tower number two, and the officer said he found three sets of footprints in that vicinity. The area was restricted and the prints followed the course pursued by the three escapees. Moreover, as the majority opinion notes, when the shooting began, accused prostrated himself on the ground between the two fences, and after the rifle fire ceased he got up and walked between them to the main gate. The ground between the enclosures was soft, wet sand, and the lieutenant testified that, except for the three sets of deep ones, there were no other prints in the area save those made by a person as he walked out from between the fences—that person being one of the three persons who had made the deep prints. Further, the officer stated he had watched the accused walk out and could, therefore, definitely identify those prints as his. Therefore, unless I rely on fantasy, there is no question but that one set of the three footprints was tied to accused. Certainly, when a record shows that three convicts cross between two fences; the ground is soft; the area is out of bounds to prisoners; three sets

of tracks only are discernible; two of the prisoners clear the second obstacle but the third fails; and the latter walks out between the fences to a gate, leaving prints which start at the point of crossing and are the same size as one of the three, it takes little imagination for me to determine that the person leaving by the gate made one of the three sets of tracks. It follows, therefore, that the questioned evidence was admissible and hence, even though the law officer may mistakenly have thought otherwise, it is obvious he did not err in failing to order the testimony stricken.

### III

Turning next to trial counsel's closing argument, as I have already pointed out, if the evidence was in the record for consideration, his statement was proper. If in fact it was ruled out, then his comment was inappropriate. But, before assuming error on his part, I set up his statement to show how innocuous and unimportant it really was in the backdrop of this record. In the course of summarizing all of the evidence, he said:

". . . We have the footprint evidence for what it's worth."

The tenor of that comment shows little, if any, reliance on the testimony.

### IV

For the purpose of this next argument, I will assume arguendo that trial counsel, by his fleeting comment, and the law officer, in failing to rule, committed error. The board of review in its opinion made this same assumption but concluded there was no prejudice. The basis of the board's decision was a finding that the accused's testimony that he jumped some twelve feet from fence to fence without touching the ground was so incredible as to be unworthy of belief. Once having drawn that conclusion, the board members apparently reasoned there was no dispute as to the relative positions of the three prisoners as they moved between the fences, and thus any error was harmless. Although I agree with the board of review, I need not go that far.

To restate the issue, it was necessary there be some evidence to show that at the outside fence the accused was near enough to Enderton to grab him; otherwise, his story of attempting to halt his fleeing companion would be unsupportable. And, parenthetically, in light of accused's claim that he was trying to prevent Enderton's escape, it might be well to point out here the exact nature of his duties toward his co-prisoner. As the majority indicates, any supervision as a guard over Enderton was the result of accused's self-appointment. Enderton suffered from nervous spells that were in large part alleviated by talking to someone, so accused was told to "talk to him, walk up and down the compound with him, work off his nervous energy." Lieutenant Rowland, the confinement officer, testified he did not mention escapes to accused, nor did he ask him to prevent Enderton from escaping. Accused's duties were merely "to try and keep . . . [Enderton] from getting too nervous, and if he got too much out of hand to let . . . . [confinement supervisors] know." In any event, although the record does not support accused's contention that he was to act as Enderton's guard, in furtherance of his story that he sought to thwart the escape, he fixed his position at the enclosures almost on the back of Enderton. The position of the footprints, however, indicated the three prisoners moved across the intervening distance between the fences along paths approximately five feet apart. That evidence alone could be reconciled with accused's story, for the witness did not fix the distance the nearest print was from the outside fence, and the accused could have moved over as he neared the second enclosure or he could have reached five feet and grabbed Enderton by the foot. But it is contended the footprint evidence belied accused's testimony that he jumped from one fence to the other, which tended to prove the accused falsified under oath, thus casting an unfavorable light on his credibility. In the light of this record, that possibility is not worth considering for at least two reasons. First, the dis-

crepancy has been inflated out of all proportion to its importance. Second, too much other competent and relevant testimony destroyed accused's credibility.

Keeping in mind that this issue only involves a falsity as it might affect credibility, I relate some of the evidence reflected in the record which very definitely accomplished that result wholly apart from any testimony concerning the footprints. The record does not contain a photograph of the first fence but, as described by the witnesses, there was a six-foot wire fence with an additional foot of barbed wire at the top. Accused's story would have him scaling this seven-foot fence with his feet about two to three feet down the reverse side. At this point, he either had to be sitting on the top wire or crouched and holding on to it. From this position, he asserts he jumped across an intervening distance of twelve feet to the other fence, which, with its one-foot barbed wire extension was about ten feet high, and grabbed Enderton's foot as the latter was clearing the top of the second barrier. That would indeed be a remarkable feat, which no doubt accounts for the fact that accused's own witness stated it was impossible. If not incredible, the contention is, to say the least, highly doubtful. Certainly, it would in and of itself create a great deal of skepticism about accused's veracity.

At this point, it might be well for me to point out that I find no support in the record for my brothers' broad statement that the above "characterization disregards the very substantial corroboration the accused received" from Enderton, DeShazo, Lieutenant Rowland, and the defense witness who said he saw accused jump from one fence to the other. Regarding Enderton and DeShazo —both of whom cleared the two enclosures in their bid for freedom—neither one gave even a single word of testimony as to the manner in which accused moved between the two fences. Certainly their evidence does not in any way corroborate accused's claim that he jumped across the interval without touching the ground. As for Lieutenant Rowland, reference to his testimony as quoted by my associates shows clearly that he said no more than that one jumping from the inner enclosure could land "*almost* up against the second fence." (Emphasis supplied.) But he did not testify the accused moved in that manner, for he did not witness the fence scaling. Moreover, it should hardly be necessary to point out the obvious difference between jumping almost to the second fence and leaping not only across the entire twelve-foot gap but in the process also maintaining enough elevation to grasp the foot of a person clearing the top of the outside ten-foot barrier. Accused, then, cannot rely on the lieutenant's statement to back up his story. That leaves us with the testimony of the defense witness who said he saw accused jump and grab Enderton's pants leg. The witness whose statement my associates quote is one Swain. In cross-examining that witness, trial counsel obviated any question as to whether he could corroborate accused's claim. Swain prefaced his statement by commenting that he did not have a good vantage point, and I quote his specific testimony on the instant matter:

"Whether he hit the ground, I don't know, because I couldn't tell that much, . . ."

Another defense witness, Stevens, at first stated that accused leaped across the space between the enclosures without hitting the ground. But upon closer questioning he recanted, testifying he would not say accused jumped from one fence to the other, but in fact that "I doubt very much if there's any possible way that he could jump from the first fence to the second fence." Accordingly, in this record I find no testimony from anyone save accused himself that he did not hit the ground between the two enclosures. Unlike my associates then, I have great difficulty in rejecting the board of review's evaluation of this point. While the excitement of an escape, like the stress of combat, great fear, or danger, might stimulate persons involved to a considerable extent and enable them to perform surprising acts of physical prowess, I am content to leave for the reader's evaluation

whether the accused's story is believable.

Assuming, however, that a reasonable person could accept the accomplishment as being possible, there is such a wealth of other evidence which shatters the accused's credibility that the footprint testimony pales into insignificance. His theory was such that, unless the court found he did not know of the plan to escape and was honestly attempting to prevent his companion from gaining freedom, he falsified. I look to the record to find whether the footprint evidence could have had any possible impact on that finding. The three prisoners were the sole occupants of a hut in the compound area. On July 6, 1958, the accused and Enderton escaped by scaling the fence, and on May 30, 1958, the accused and the third escapee attempted to flee by the same method. Those instances reflect an avid desire on his part to join with his friends to gain freedom and cast serious doubt on his claim that in this instance he was against and not with them. On the morning of this escape, the plan was discussed in the tent where only the three lived and while all were present, although it is asserted the accused was uninformed of the contemplated action. However, he was seen lined up with his associates in a formation which led a stockade guard to believe they were policing the area immediately prior to the time they broke and ran for the fence. When they bolted, he was either abreast of the other two or in close pusuit but some distance to the side. The extent of his duty to Enderton was to walk and talk with him when he got a nervous spell and notify the confinement officials so they could call a psychiatrist. He had no obligation to keep him confined. At the trial defense introduced accused's pretrial statement in evidence. It was given on the day of the attempt and was in question and answer form. Therein he states that he jumped between the two fences, and when he hit the ground Enderton was halfway up the outside fence. This, of course, conforms with the footprint evidence but when confronted with his inconsistency, accused testified that although he was sworn before he executed the document, he signed the statement and initialed it in several places without reading or knowing its contents—a rather strange disclosure about a statement which very effectively corroborates all the material evidence as to his alleged purpose which he furnished at trial and which could have only been known to him. Superimposed upon his own inconsistencies is the testimony of at least three Government witnesses and two defense witnesses. They all testified he traveled on the ground between the fences and one defense witness said it was impossible for the accused to jump from fence to fence. While the evidence shows that accused was not truthful in his testimony on many other material matters, we are only concerned with the one evidentiary item.

From what I have stated, it is apparent that the testimony as to footprints was only cumulative of the evidence of all live witnesses. See United States v Drain, 4 USCMA 646, 16 CMR 220. Obviously a court-martial may believe one as against many but when an accused puts his credibility in issue by testifying contrary to all other witnesses, friendly and adverse, and his story is so fantastic as this one appears to be, it is impossible for me to believe that an unconnected circumstance would have any impact on his veracity. Particularly is that true when the law officer had thrice expressed opinions that the evidence did not point to the accused. In my view, any error was clearly harmless.

## V

That brings me to the second issue. It concerns the definition of reasonable doubt given by the law officer. It is sufficient for the purpose of this dissent to state that his instruction followed the language of paragraph 74a(3), Manual for Courts-Martial, United States, 1951, which we approved in United States v Moore, 4 USCMA 482, 16 CMR 56. Not only do the law officer's instructions meet the tests of our prior decisions on this question, but in the case at bar

there were no requests for amplification or clarification. In fact, defense counsel expressly assured the law officer that the instructions given were satisfactory. Accused cannot, therefore, succeed in this assignment on appeal. United States v Felton, 2 USCMA 630, 10 CMR 128; United States v Phillips, 3 USCMA 137, 11 CMR 137; United States v Kloh, 10 USCMA 329, 27 CMR 403.

For the above stated reasons, I am unable to agree with my associates. In my view, both assignments advanced by the defense are without merit. I would affirm the decision of the board of review.