UNITED STATES, Appellee

v.

WINFRED D. MOORE, Private E–2, U. S. Army, Appellant

4 USCMA 482, 16 CMR 56

No. 4370
Decided July 2, 1954

LT COL James C. Hamilton, U. S. Army, for Appellant.

LT COL William R. Ward, U. S. Army, MAJ Irvin M. Kent, U. S. Army, and 1ST LT William G. Fowler, U. S. Army, for Appellee.

## Opinion of the Court

PAUL W. BROSMAN, Judge:

This case is before the Court for mandatory review pursuant to the requirements of the Uniform Code of Military Justice, Article 67(b)(1), 50 USC § 654. Moore, the accused, was convicted by general court-martial at Fort Bragg, North Carolina, of murder while engaged in the perpetration of a robbery and of assault with intent to commit robbery—in violation of the Uniform Code of Military Justice, Articles 118 and 134 respectively, 50 USC §§ 712, 728. He was sentenced to death. The sentence was approved by the convening authority and has been affirmed by a board of review in the office of The Judge Advocate General, United States Army.

### II

A summary of the facts on which the conviction was based is required for disposition of the errors assigned on appeal. Having been relieved from guard duty at approximately 10:00 p.m. on the evening of June 30, 1953, the accused entered a taxicab operated by one Charles W. Pettit, for the assigned purpose of being transported to Fayetteville, North Carolina. He sat in the rear of the vehicle, and at that time had in his possession the .45 calibre pistol, which had been issued to him as a guard. Within a short time the cab was hailed by another soldier named Smith, who entered and seated himself beside the driver, Pettit. This was done over the objection of accused, who advised Smith to wait for another vehicle. After proceeding in the direction of Fayetteville for some two miles, the accused directed Pettit to turn from the highway to a dirt road, and shortly thereafter directed him to halt. Smith testified that, as Pettit turned in his seat to collect his fare, the former heard "the slide of a forty-five going back and forward" and immediately thereafter a shot, which caused the driver to slump at the steering wheel. A second shot felled Smith as he attempted to escape

from the vehicle. The accused removed Pettit's body from the cab, dragged it into nearby shrubbery, and subsequently placed the wounded Smith on the roadside after robbing him of his wallet. Accused then drove away in the automobile, which was later found abandoned. Smith, and the body of Pettit—who had been killed instantly— were discovered near 8:00 the following morning. Pettit's discarded billfold was found approximately one mile from the place at which his body was located.

In addition to the eyewitness account of Private Smith, there was prosecution evidence tending to show that the accused was absent from the guard house—where the relief slept customarily—from 10:00 p.m. on June 30 until 2:00 a.m. on July 1, when he again entered on duty; and that the pistol issued to him was not relinquished to the arms room until shortly after midday on July 1. An expert witness testified that the slug found in Pettit's body had been fired from the weapon issued the accused. The prosecution also introduced three written statements of the accused to the effect that he had intended to rob Pettit and Smith; that the former had offered resistance when ordered to surrender his money; and that the accused had thereupon shot them both. Since the first assignment of error relates to the admission of these statements at the trial, we shall examine the circumstances surrounding their acquisition.

The accused was taken into custody on July 3, 1953, and—after having been warned of his rights under Article 31, 50 USC § 602—was questioned by members of the Criminal Investigation Detachment at Fort Bragg. On this date he declined to make a statement. Thereafter, at approximately 8:00 on the mornings of July 4, 6, and 7 he was taken from the detention cell of the post stockade to military police headquarters and questioned further. On each of these occasions he was warned

484

of his rights under Article 31. On these three dates the accused made incriminating statements, which were reduced to writing and signed by him. According to the testimony of investigating officers, he was never interrogated for more than 45 consecutive minutes; provision was made for serving him lunch each day; and no sort of threats, promises or inducements were employed to obtain the statements in question. Moreover, at the request of the accused, his wife was brought to the post by a Detachment agent on July 4, so that the former might talk to her. Following this conversation he executed the first statement admitted at the court-martial hearing. It was conceded that the accused was not furnished counsel during these inquiries; that he was kept in a separate detention cell in the post stockade; and that his brother was refused permission to see him on the afternoon of July 5. The accused declined to take the stand on the issue of voluntariness, and the only testimony concerning these events came from investigating officers.

## III

Appellate defense counsel argues that the statements in question were involuntary and inadmissible because: (1) the accused was detained without charges having been preferred against him from July 3 until July 7, and questioned repeatedly after he had refused to execute a statement on July 3; (2) he was without counsel throughout the investigation; and (3) he was not permitted to receive visitors—specifically, his brother—while in the post stockade. We shall consider these contentions in the order in which they have been set out.

Paragraph 18*b* of the Manual for Courts-Martial, United States, 1951, provides for the arrest or confinement of one subject to the Code, and accused of an offense thereunder, "as circumstances may require." In addition, this legal source states specifically that, although charges *should* be preferred promptly, an accused is not to be released from restraint automatically because of delay in preferring them, but must remain in confinement until lib-

erated by proper authority. Paragraph 22. This same division of the Manual makes provision for the investigation of undue delay in preferring charges, with a view to effecting either a prompt disposition of the case or a release of the accused. Further, the Uniform Code of Military Justice, Article 33, 50 USC § 604, requires that charges be forwarded to the officer exercising general court-martial jurisdiction within eight days after the accused is ordered into arrest, or, in the alternative, that a written explanation of the delay be furnished. It is manifest from the record in the case at bar that the military authorities concerned complied fully with these provisions. The accused was with good cause taken into custody on July 3 and charges were preferred four days later. Moreover, following the accused's inculpatory statement of July 4, his further detention was virtually mandatory. It is clear that no rights of his were violated by his detention until charges were filed, and that the position of defense counsel that his statements were for this reason inadmissible is not well taken.

Nothing contained in the decisions relied on by the defense requires us to retreat from this position. Entirely inapplicable in the present setting is the rule obtaining in the Federal courts which denies admissibility to confessions secured as a result of the illegal detention of an accused. McNabb v. United States, 318 US 332, 87 L ed 819, 63 S Ct 608; Upshaw v. United States, 335 US 410, 93 L ed 100, 69 S Ct 170. In promulgating the so-called "McNabb rule" of exclusion, the Supreme Court has pointed out that the doctrine is not based on any consideration of self-incrimination, in violation of the Fifth Amendment, but rather constitutes a rule of evidence—judicially created—prohibiting the use in criminal cases of confessions obtained as a result of noncompliance with a Federal statute. That statute now substantially embodied in Rule 5, Federal Rules of Criminal Procedure, 18 USCA, required that one under arrest be brought without unnecessary delay before a committing magistrate, and that, on ap-

485

pearance, a complaint shall be filed forthwith. It has no counterpart in the military judicial system; and the Federal decisions enjoining compliance with its terms cannot at all operate as a restriction on the admissibility of confessions in trials by courts-martial. Indeed, the Supreme Court has declined to extend the doctrine to prosecutions in state courts—and has reaffirmed that, in so far as due process is concerned, the accepted test for the admissibility of confessions is their voluntariness. Gallegos v. Nebraska, 342 US 55, 96 L ed 86, 72 S Ct 141.

Aside from the special problems posed by a failure to warn an accused of rights granted by Article 31 of the Uniform Code, this Court has uniformly held that the basic question with regard to voluntariness is "whether the accused possessed, at the time of the confession, mental freedom to confess or deny participation in the crime." United States v. Monge, 1 USCMA 95, 98, 2 CMR 1; United States v. Colbert, 2 USCMA 3, 7, 6 CMR 3; United States v. Fair, 2 USCMA 521, 529, 10 CMR 19; United States v. Josey, 3 USCMA 767, 775, 14 CMR 185. Moreover, in the Colbert case, supra, we observed that:

"It must be understood that 'voluntary' as used in law with respect to a confession is in no way synonymous with 'spontaneous.' The term does not at all connote that a confession, to be admissible, may not have been extracted from the defendant by searching examination and the use of prodding questions. Rather it means that the confession must be the product of free choice—of a will not encumbered or burdened by threats, promises, inducements, or physical or mental abuse."

In the instant case there is no slightest suggestion that threats, promises, or inducements were employed to obtain a confession from the accused, nor is there any sort of showing of protracted and relentless questioning without food, rest, or relief. On the contrary, it affirmatively appears that the accused was never questioned for so much as an hour at any one time; that proper provision was made that he be fed; and that he was returned to the detention cell of the post stockade for rest each night. On the very morning following his arrest, the accused made his first incriminating statement. In view of these facts, the contention that any statement made by the accused after his initial refusal was involuntary is wholly without merit. Certainly the investigators were not required to refrain from further questioning simply because the accused originally declined to execute a statement. It is not difficult to imagine the stultification of investigative procedures which would result were we to hold otherwise. In this connection the observations of Mr. Justice Jackson in the recent case of Stein v. People of State of New York, 346 US 156, 184, 97 L ed 1522, 1541, 73 S Ct 1077, are significant:

". . . Interrogation is not inherently coercive, as is physical violence. Interrogation does have social value in solving crime, as physical force does not. By their own answers many suspects clear themselves, and the information they give frequently points out another who is guilty. Indeed, interrogation of those who know something about the facts is the chief means to solution of crime. The duty to disclose knowledge of crime rests upon all citizens. It is so vital that one known to be innocent may be detained, in the absence of bail as a material witness. This court never has held that the Fourteenth Amendment prohibits a state from such detention and interrogation of a suspect as under the circumstances appears reasonable and and not coercive."

As a second basis for assault on the voluntariness of these confessions, defense counsel argue that the accused was not furnished with counsel during the interrogations. While it is worthy of note that he is not known to have made any request therefor, the complete answer to this contention is that no right exists to be provided with appointed military counsel prior to the filing of charges. United States

v. Manuel, 3 USCMA 739, 14 CMR 157; United States v. Shaull [CM 359571], 10 CMR 241; United States v. Nicholson [ACM 4903] 4 CMR 519. In the Shaull case, supra, the board of review pointed out in considering the question here presented:

"The Uniform Code of Military Justice requires that counsel shall be provided for an accused in only three situations: at the Article 32 investigation; at a special or general court martial; and during appellate review in appropriate cases (UCMJ, Arts. 27a, 32b, 38b, 70c). Nowhere in the Code or in the Manual is there any provision according a person suspected of a crime the right to demand legal counsel prior to the preferring of charges against him."

Although we have had no previous occasion to pass on the precise point, we adopt the conclusion reached in the cases cited. Moreover—as was pointed out by the board of review in the instant case—this rule is by no means unique to the military establishment. State court decisions have likewise rejected the contention that an accused has an unqualified right to counsel before he has been charged. Commonwealth v. McNeil, 328 Mass 436, 104 NE2d 153; State v. Bunk, 4 NJ 461, 73 A2d 249. Furthermore, the Supreme Court has frequently indicated that, in the absence of coercive practices, there exists no constitutional prohibition against police examination in private of those in lawful custody, or the use of voluntary information secured thereby. United States v. Carignan, 342 US 36, 96 L ed 48, 72 S Ct 97; see also Lisenba v. California, 314 US 219, 239, 86 L ed 166, 62 S Ct 280; Ziang Sung Wan v. United States, 266 US 1, 14, 69 L ed 131, 45 S Ct 1.

The third objection to the voluntariness of these confessions—the failure of the authorities to permit ▮ the accused to receive visitors while in detention— may be dismissed as frivolous. By the time of his brother's visit, the accused had seen his wife, and had executed a statement in which he admitted having shot the deceased and Private Smith. The supplemental statements of July 6 and 7 did no more than to amplify certain phases of the original confession and to provide particulars which had previously been omitted. It is also apparent that the brother was refused permission to visit the accused solely because he had failed to arrive during the regular visiting hours prescribed for the post stockade. We fail to see how these facts can possibly form the basis for a claim of psychological coercion vitiating the voluntary character of accused's statements.

IV

The final assignment of error relates to the law officer's definition of reasonable doubt supplied ▮ in the course of instructions to the court-martial. Specific objection is taken to the following instruction given at the trial:

". . . A court-martial which acquits because, upon the evidence, the accused may possibly be innocent, falls as far short of appreciating the proper amount of proof required in a criminal trial as does a court which convicts on a mere possibility that the accused is guilty."

It is the position of appellate defense counsel that this instruction serves to place on the shoulders of the accused the burden of establishing a reasonable doubt.

With this we cannot agree. In United States v. Soukup, 2 USCMA 141, 7 CMR 17, we held that—in the absence of a request by counsel—the law officer labors under no duty to define reasonable doubt, and that the requirements of the Code and the Manual for Courts-Martial are satisfied by a charge to the effect that the accused's guilt must be established beyond a reasonable doubt, and that any such doubt must be resolved in his favor. Here the law officer went beyond minimal requirements by seeking to define reasonable doubt in accord with the precise wording of the Manual, supra, paragraph 74a(3). Indeed the questioned instruction is taken verbatim from that language.

The law officer, in accordance with the mandate of Article 51(c), Uniform

**487**

Code of Military Justice, 50 USC § 626, had earlier charged on the presumption of innocence and the effect of a reasonable doubt on the findings of the court. Moreover, he had pointed out specifically that the burden of proving the accused's guilt beyond a reasonable doubt rested on the Government. When considered within this context—and especially in the light of the last-mentioned instruction—it is apparent that the challenged phrasing amounts to no more than an explanatory summary of the meticulous definitions of reasonable doubt expressed in the sentences which preceded it. Viewed as a synopsis of one aspect of the law officer's entire charge, the instruction in question was not misleading. See United States v. Phillips, 9 CMR 186, 195, *rev'd on other grounds,* 3 USCMA 137, 11 CMR 137.

In addition we note that, at the conclusion of the charge to the court, defense counsel took no exception to the instructions as given, made no request for clarification, and offered no supplemental or alternative phrasing for the law officer's consideration. We have frequently declared that the burden of requesting elaboration or clarification of instructions rests on the shoulders of defense counsel. United States v. Offley, 3 USCMA 276, 12 CMR 32; United States v. Felton, 2 USCMA 630, 10 CMR 128; United States v. Soukup, supra. Considering the basic and general appropriateness of the instruction given, together with the failure of defense counsel to request clarification or offer additional language, we conclude that the second assignment of error is without merit.

V

It follows from what has been said that the law officer did not err in admitting the pretrial statements of the accused, or in instructing the court on reasonable doubt. The decision of the board of review must, therefore, be affirmed.

Chief Judge QUINN and Judge LATIMER concur.