UNITED STATES, Appellee

v

JOAQUIN Q. ACFALLE, Staff Sergeant, U. S.
Air Force, Appellant

12 USCMA 465, 31 CMR 51

*Major William A. Crawford, Jr.*, argued the cause for Appellant, Accused. With him on the brief were *Colonel James L. Kilgore, Colonel Philip J. Williamson*, and *Lieutenant Colonel Daniel E. Henderson, Jr.*

*Major John C. Wiley* argued the cause for Appellee, United States. With him on the brief was *Colonel Merlin W. Baker.*

## Opinion of the Court

HOMER FERGUSON, Judge:

Tried by general court-martial upon a charge of larceny, in violation of Uniform Code of Military Justice, Article 121, 10 USC § 921, the accused was found guilty and sentenced to dishonorable discharge, confinement at hard labor for three years, reduction to the grade of Airman Basic, and a fine of $5,000.00, with provision for two additional years of imprisonment in the event such fine was not paid. The convening authority approved the sentence. The board of review found neither legal nor factual error, but, on the basis of appropriateness, reduced accused's punishment to dishonorable discharge, confinement at hard labor for two years, reduction to Airman Basic, and a fine of $1,500.00, with provision for eighteen months' additional confinement in the event the fine was not paid.

We granted the accused's petition for review on the question whether his confessions were properly received in evidence against him; whether a motion to make the specification more definite and certain should have been granted; and whether the law officer's instructions on the elements of larceny were proper. We turn to the question of the confessions for our resolution of that issue serves to dispose of the case.

The accused, a native of Guam and an Air Force staff sergeant, served for a considerable period of time in an assignment to the Commissary Store, Andersen Air Force Base, Guam. There, he rose to the position of Store Manager. During his tenure—the period alleged in the specification—the store suffered an initially unexplained loss of $35,260.23. Under accepted accounting principles, a normal loss for the same period would have amounted to approximately $8,000.00. Investigation of the store's management caused suspicion to be directed to accused. At the time, he had been transferred to an air base in the United States where he was also serving as Commissary Store Manager.

Agents Lane and Platt, Office of Special Investigations, were detailed to investigate operations at the Andersen Commissary. By tapping a Government telephone line, they learned the accused and his family were returning to Guam on leave because of the illness of his parents-in-law. Arrangements were made to take him into custody.

On May 24, 1960, accused departed by air for Guam. En route, he suffered from motion sickness. On May 26, 1960, he arrived with his family. When he left the airplane, he was apprehended by Air Police and immediately taken to their Headquarters. His family was allowed to proceed to the hospital in which his wife's parents were located.

Accused was informed that his leave had been terminated and that he had been placed on temporary duty. Shortly thereafter, Agents Lane and Platt arrived at Air Police Headquarters.

They advised the accused that he was suspected of being involved in irregularities at the Andersen Commissary. They also stated that he was being placed on temporary duty in Japan for period of seven days. Accused was told he might make any telephone calls he desired, provided the parties spoke in English and the calls were monitored by the agents.

Accused called his wife and informed her he was going to Japan on temporary duty. He asked that she bring clothing to him on the following day. He made no other calls.

On May 27, accused's wife appeared with his clothing. She was permitted to speak with him upon condition that they talk only in English and that an agent monitor their conversation. She asked that accused's brother-in-law be permitted to speak with him, but Agent Lane refused to allow it on the basis that it was unnecessary. Accused remained in confinement until the following morning. At that time, he and Agents Lane and Platt departed via Government aircraft for Japan. En route, accused was again air sick. Upon arrival at Yokota Air Base, he was released from custody by the agents and informed by a local commander that he was restricted to the base. He was also directed to report to the Office of Special Investigations at 6:00 p.m.

Accused was driven to his quarters in a transient barracks. En route, he assisted his driver in delivering cargo which had arrived on the plane with him. As a result, he was a few minutes late in arriving at the Office of Special Investigations. There, he met Agents Lane and Platt again.

Accused was again advised of his rights under Code, supra, Article 31, 10 USC § 831, and told the nature of the accusation against him. He was interrogated for approximately forty-five minutes and released. On the following day, the questioning was resumed at approximately 1:00 p.m., the accused having desired to attend church services that morning. It continued until 9:15 p.m., with time being taken out for the evening meal.

On May 30th, Platt and Lane again questioned the accused. This interview lasted from 9:00 a.m. until approximately 3:00 p.m. Lunch intervened, and most of the afternoon was occupied in typing and correcting accused's statements. Before each interview, accused was readvised of his rights and his attention focused upon the scope of the inquiry. The purpose of confining accused and removing him from Guam to Japan was "strictly and entirely for the purpose of isolating him" and to have available facilities for a polygraph examination.

The foregoing represents the Government's evidence in support of the admissibility of the confessions. The accused, testifying with respect to their voluntary nature, denied that he had been warned of his rights or advised of the nature of the investigation. On the contrary, he suspected that his detention arose from an inadvertent security violation which had occurred in connection with his earlier telephone call to Guam. He confirmed that he was not allowed to speak with his wife in private or in his native language. Moreover, he testified that he was suffering from the aftereffects of motion sickness and that he made the statements in question only because he was seriously concerned over the condition of his wife's parents—for whom he had a great deal of affection—and was told that he could return to Guam as soon as he had confessed. He told the agents to compose any statement they wished, and he would sign it. Finally, he alleged that he was also advised that no criminal proceedings were contemplated but that the information was desired only to complete the commissary investigation.

Accused admitted that he had freely been permitted to contact a relative at nearby Tachikawa Air Force Base and was only under restriction at Yokota. Moreover, while awaiting transportation back to Guam, he called his wife and shopped for Japanese chinaware. These latter events, however, transpired after he had signed the prosecution exhibits.

Agents Lane and Platt denied making any promises to the accused or repre-

senting that the statements would not be used against him. They reiterated that accused, after full and proper warning, freely and knowledgeably confessed his guilt.

The law officer ruled that the confessions were admissible. At the time they were received in evidence and again at the conclusion of the case, he instructed the court-martial as follows:

"I will also instruct the court again with reference to my ruling receiving in evidence Prosecution Exhibits 1 and 2. You are advised that my ruling receiving in evidence Prosecution Exhibits 1 and 2, the out-of-court statements of the accused with respect to the Charge and Specification, is final only on the question of admissibility. My ruling merely places this testimony before the court. It does not conclusively establish the voluntary nature of the statements of the accused. Each of you in your deliberations upon the findings of guilt or innocence, must come to your own conclusions as to the voluntary nature of the statements of the accused. If you determine that such statements were involuntary, you must, and I emphasize the word 'must' refuse to consider them as evidence. You may accept the statements as evidence only if you determine that such were voluntarily made. The standard you are to use in making this determination is that you may accept the statements as evidence only if you determine, beyond a reasonable doubt, that they were voluntarily made. You are also advised in this connection that if you find the statements were voluntary, any evidence introduced with reference to the voluntary or involuntary nature of the statements may be considered by you in determining the weight that you will give these statements. You are further advised that such out-of-court statements of the accused are not voluntary if they were obtained from the accused through the use of coercion, unlawful influence or unlawful inducement. You will also consider that such statements were not voluntary if you find

that after charges had been preferred against the accused, or while he was suspected of the offense, they were obtained from him through the interrogation or at the request of a person subject to the Uniform Code of Military Justice, who did not first inform the accused of the nature of the accusation and advise him that he did not have to make any statement regarding the offense of which he was accused or suspected, and that any statement made by him might be used as evidence against him in a trial by court-martial. The basic question with regard to voluntariness is whether the accused possessed, at the time of the confession, mental freedom to confess or deny participation in the crime."

There can be no doubt that the foregoing testimony raises a substantial issue concerning whether accused's confession was entirely voluntary. True it is that we noted in United States v Moore, 4 USCMA 482, 16 CMR 56, that confinement alone does not give rise to intimations of coercion, but the admitted circumstances of this accused's detention far transcend the situation before us in that case. Completely aside from his denial of proper advice under the terms of Code, supra, Article 31, his testimony that he was told the statements would not be used against him, and the declaration that he was informed he would be able to return to Guam only when he made the statements, the Government's own proof reveals that the accused was here subjected to measures which, in themselves, raise a strong question whether his will was entirely free. United States v Monge, 1 USCMA 95, 2 CMR 1; United States v Josey, 3 USCMA 767, 14 CMR 185. Thus, he was apprehended upon his arrival in Guam; held in isolation by the authorities; refused permission to speak with his wife except in English and in the presence of an agent; and permitted to make no telephone calls unless they were in English and monitored. He was admittedly spirited away from Guam to Japan in order that he might be completely isolated

from his family and friends. Compare Culombe v Connecticut, — US —, 6 L ed 2d 1037, — S Ct —, decided June 19, 1961; Ward v Texas, 316 US 547, 86 L ed 1663, 62 S Ct 1139 (1942); Haley v Ohio, 332 US 596, 92 L ed 224, 68 S Ct 302 (1948); Turner v Pennsylvania, 338 US 62, 93 L ed 1810, 69 S Ct 1352 (1949); and Fikes v Alabama, 352 US 191, 1 L ed 2d 246, 77 S Ct 281 (1957). While the United States Air Force is clearly authorized to issue orders revoking an enlisted man's leave and placing him on temporary duty at another installation, it may not perversely use this authority as a coercive instrument for the purpose of removing him to a location at which he is effectively isolated and likely to succumb to police pressures. To hold otherwise would provide military investigators with an instrument of oppression which has long since been denied their civilian counterparts. Culombe v Connecticut, supra. In short, just as civil police may not hold a suspect incommunicado or spirit him from place to place, military police may not transfer an accused from island to island or impose unreasonable conditions on his right to seek comfort and assistance from friends, relatives, and attorneys. See Culombe v Connecticut and Fikes v Alabama, both supra.

We do not, however, conclude that Acfalle's two statements were inadmissible as a matter of law. While the tactics employed by Agents Platt and Lane are deplorable, there are circumstances in the record from which both the law officer and the members of the court-martial could infer that accused confessed, not because of his removal from Guam to Japan, his airsickness, the illness of his relatives, the lack of full communication with his wife and brother-in-law, and the other circumstances here depicted, but because of an overwhelming consciousness of guilt. We, therefore, turn to the issue whether the law officer meaningfully submitted the question of the statements' voluntariness to the court members. We are compelled to conclude that he did not.

The law officer's advice regarding Acfalle's confessions is set out above.

He advised that his ruling was final only on the question of admissibility and "does not *conclusively* establish the voluntary nature of the statements." (Emphasis supplied.) He then emphasized, on the one hand, that the statements must be rejected if it were determined that they "were involuntary" and, on the other, that they could be considered as evidence only if it were concluded that they were voluntarily made. He referred to lack of voluntariness being demonstrated by evidence of coercion, unlawful influence, or unlawful inducement. He delineated the need for a proper warning under Code, supra, Article 31, and concluded that the "basic question" to be resolved with regard to voluntariness was whether accused possessed the "mental freedom to confess or deny participation in the crime."

We pass the law officer's comment to the court members that his ruling did not "conclusively" establish the voluntary nature of the statements and the seeming inconsistencies in the standards he set forth. See United States v Andis, 2 USCMA 364, 8 CMR 164. We find here a more basic insufficiency.

The law officer's advice consists of no more than a bare recital of the conclusions which the court members must reach before the confessions could be considered. Only at one place did he refer to the question whether accused possessed mental freedom during his interrogations, but, even then, he did not relate that inquiry to the facts before the court-martial. He made no mention of the need for the court members to consider accused's detention, the conditions imposed upon his communications with his wife, the refusal to allow him to see his brother-in-law, the illness of his family, or his summary removal to Japan where he was as effectively deprived of the moral support of his friends, relatives, and associates as if he had been placed in solitary confinement. Yet, it was not likely to occur to the court members, without further elucidation, that it was improper so to delimit accused's rights. Thus, unless their attention was di-

rected to the evidence regarding voluntariness and its connection with accused's claim that he succumbed to the pressures thus brought against him, it is not probable that they made any meaningful determination concerning his confessions. In short, the law officer's instructions were not tailored to the peculiar situation presented by this record, and he apparently failed to recognize possible considerations of constitutional due process involved in the court's ultimate decision on the statements. See Rogers v Richmond, 365 US 534, 5 L ed 2d 760, 81 S Ct 735 (1961).

In United States v Jones, 7 USCMA 623, 23 CMR 87, we generally approved the principles of law set ■ forth by the law officer in his advice. We did not, however, mean to state that a bald recital of these abstract propositions of law would suffice to advise a military jury of its duty. In many cases, it undoubtedly will, for the accused's contentions of involuntariness normally relate to whether he was properly warned or acted as a result of unlawful inducements or promises. See United States v McKay, 9 USCMA 527, 26 CMR 307, and United States v Williams, 2 USCMA 430, 9 CMR 60. When, however, the question involves whether the accused was deprived of his volition to speak or remain silent by the use of measures which, to the military court member, might bear some semblance of legality, the facts before the court-martial must be related to the legal principles involved in such a manner that the members are clearly made aware of the need for their consideration of each such circumstance.

There is nothing novel in the doctrine which we apply to the record before us. The need for tailoring instructions to the matters in evidence has been recognized on many occasions. United States v Weems, 3 USCMA 469, 13 CMR 25; United States v Floyd, 2 USCMA 183, 7 CMR 59; United States v Ginn, 1 USCMA 453, 4 CMR 45; 53 Am Jur, Trial, § 573. See also United States v Thompson, 12 USCMA 438, 30 CMR 24. Indeed, one of the armed services has long since recognized the validity of this principle. Department of the Army Pamphlet No. 27–9, Military Justice Handbook, The Law Officer, April 1958, page 5.

The foregoing considerations make it clear that reversal is here required. Without adequate guideposts, there is a fair risk that the court members did not properly resolve the issue whether accused's confession resulted from his consciousness of guilt or whether he succumbed to the isolation in which he was placed; to the deprivation of the moral support of his wife and relatives; to the belief that his return to Guam and his family might result from cooperation with Lane and Platt; and to other pressures under which he was placed. He is, therefore, entitled to a hearing before another, properly advised court-martial. Rogers v Richmond, supra.

The decision of the board of review is reversed and the record of trial is returned to The Judge Advocate General of the Air Force. A rehearing may be ordered.

Chief Judge QUINN concurs.