UNITED STATES, Appellee

v

WILLIE M. TANNER, JR., Airman Basic,
U. S. Air Force, Appellant

14 USCMA 447, 34 CMR 227

447

Lieutenant Colonel Andrew S. Horton argued the cause for Appellant, Accused. With him on the brief were Colonel Daniel E. Henderson, Jr., and Major William A. Crawford, Jr.

Lieutenant Colonel Robert M. Haynes argued the cause for Appellee, United States. With him on the brief was Colonel Emanuel Lewis.

## Opinion of the Court

FERGUSON, Judge:

Arraigned and tried before a special court-martial convened at Seymour Johnson Air Force Base, North Carolina, the accused was found guilty of larceny, in violation of Uniform Code of Military Justice, Article 121, 10 USC § 921, and sentenced to bad-conduct discharge. Intermediate appellate authorities affirmed, and we granted accused's petition for review upon the issue whether the president's instructions concerning the voluntariness of accused's confession were adequately tailored to the evidence.

On April 11, 1963, a Sergeant Collins left his toolbox, containing numerous tools issued to him by the United States, in its proper place at the hangar at which he worked. The box was locked to a rack with a cable running through its hasp. On April 16, he discovered the box was missing.

Airman John Gimby, a good friend of the accused, drove the latter by the hangar in which Collins worked on April 14, 1963. At accused's request, he stopped. Tanner entered the hangar briefly and returned to Gimby's car with a toolbox later identified as being that issued to Collins. The men proceeded to their place of duty, and Tanner secured the box and its contents in the trunk of Gimby's car.

On April 17, Gimby drove Tanner to the former's home off post. There, the toolbox was taken into Gimby's quarters and its contents examined in the presence of Gimby's wife and a neighbor, Mrs. McIntosh. Mrs. McIntosh asked Gimby "if the tool box had been stolen." Gimby "just laughed" and

"Tanner says, 'No, I did the dirty work.' "

The box's contents were placed in a laundry bag and both it and the box were removed from the house. According to Gimby, accused took all the tools with him and borrowed his car in order to dispose of the toolbox. Gimby testified that Tanner also "threw the tools away."

As a result of information received from Mrs. McIntosh, accused came under suspicion in the alleged theft. On the morning of April 17, 1963, he was interrogated by Sergeant Grimes, an Air Police investigator, after proper warning under Code, supra, Article 31, 10 USC § 831. Grimes questioned Tanner "off and on all day long." He was permitted to go to lunch, to use the restroom, and to obtain water when desired. The questioning was interspersed with periods during which Grimes and another investigator, Sergeant Lavins, checked out leads and developed new evidence with which to confront accused. Accused gave no statement on the 17th.

On April 18, Tanner was questioned by Sergeant Lavins between the hours of 7:30 a. m. and 9:30 a. m. Accused again made no incriminating statement and was released.

On April 19, Lavins and Grimes again interrogated accused from about 9:30 a. m. to about 9:50 a. m. The questioning was terminated at the latter hour when accused requested counsel. He was permitted to seek legal advice. At approximately 10:20 a. m., the interview recommenced and con-

tinued until 11:50 a. m. At that time, it was again ended to allow accused to consult with his counsel. Accused made an appointment with the legal office at 1:00 p. m., and was told to return to the Air Police building when his consultation was finished.

At 2:30 p. m., Tanner's questioning began again and was continued until 4:00 p. m., when he was once more afforded the opportunity to call his lawyer. Following that consultation, the interrogation was resumed, and, at approximately 4:20 p. m., accused made an oral statement to Grimes in which he divulged the location of the missing tools and toolbox and confessed that he had stolen them.

Grimes testified he informed accused —after he had consulted with his counsel at 4:00 p. m.—that he "could turn the case over to the FBI and let them investigate it." He also told Tanner "we had cases on [Airman] Barnhill that were not processed and he got out under a 39–16 or 39–17 [administrative discharge regulations]." Accused was informed "it could happen to him" and that "Airman Barnhill was allowed to leave the service without his case being prosecuted against him and that he was afforded a discharge without it being processed against him."

Grimes denied he told accused such would happen in his case, or that "he would be discharged rather than court-martialled." He informed him "it was a possibility," but he did not condition such action upon the accused's making a statement. "Anything," Grimes further declared, "I might have said would be to get him to talk."

Accused, testifying on the issue of the voluntariness of his statement, agreed in general with the investigator's testimony concerning the length of his interrogation and the conditions under which it was conducted. However, he differed substantially in his account of the final interview with Grimes. According to Tanner, Grimes said:

". . . [H]e was giving me til [sic] 4:30—it was 3:30 or 4 o'clock then—and he was going to turn the case over to the FBI and if I was found guilty I would be punished more than if I cooperated with him.

. . . . .

". . . Sergeant Grimes told me he was going to have to turn it over to the FBI and he stated, 'Tanner, it will be better for you and me if you cooperated', and he says since I was due discharge, nine times out of ten —that he had been investigating ten years and he knew how courts generally go and then he said nine times out of ten the court would go on and put this in the unfiled book and that is when he showed me Airman Barnhill's case. He went across the hall and brought this book back and showed me Airman Barnhill was still on file." [Record of Trial, pages 68, 69.]

Accused knew Barnhill and was aware of the fact that he had been discharged. He believed the same action would be taken in his case, and in reliance on Grimes' statements, confessed his guilt.

Defense counsel objected both to the introduction of accused's statement and to the receipt in evidence of the tools which were located as a result of that confession. He claimed the former was involuntarily obtained and that the latter was its product. His objections were overruled by the president, who, in his final instructions, submitted the issue to the court as follows:

"You are advised that the ruling admitting in evidence the testimony of the accused's out-of-court statements concerning the offense charged merely places such testimony before the court, and does not establish the voluntary nature of the statements made by the accused. You may accept the statements as evidence only if you determine beyond reasonable doubt that they were voluntary. Otherwise, you must reject the statements and disregard them as evidence in the case. You are instructed in this connection that these out-of-court statements of the accused are not voluntary if they were obtained through the use of coercion, unlawful influence, or unlawful inducement.

The test of whether the statements were produced by coercion, unlawful influence or unlawful inducement, is whether under the facts determined by you, the accused was deprived of his mental freedom to choose to remain silent or to make a statement.

"Each member of the court in his deliberation on the findings of guilt or innocence, must come to his own conclusion as to the voluntary nature of the statement and accept it or reject it, accordingly. You may also consider any evidence introduced as to the voluntary or involuntary nature of the statement as to the weight to be given to the statement.

. . . . .

"The court is further advised that the United States Government has the burden affirmatively to establish the voluntariness of the confession. It must affirmatively overcome the evidence of involuntariness and present proof sufficient to convince the members of the court beyond a reasonable doubt of the voluntariness of the accused's statement. The reasonable doubt standard is the strictest and hardest standard in the law to satisfy. It is the same standard by which you must determine the accused's guilt or innocence of the offense charged."

There can be no doubt that the testimony of Sergeant Grimes and the ■■■■■■ ■ accused raises a grave issue concerning the voluntariness of the latter's confession. If the evidence favorable to Tanner was to be credited by the fact finders, it would appear that Grimes, after long questioning of the accused, rendered fruitless by the interposition of legal advice, obtained the statement and disclosure of the tools' location by bluntly threatening him with severe punishment at the hands of the civil authorities if he did not confess, as opposed to promising avoidance of prosecution altogether if he did cooperate. As to the last mentioned alternative, we note that the record discloses accused's administrative separation from the service was pending at the time of the interrogation, and even Grimes' testimony concerning the discussion of allowing such procedures to be carried out in lieu of prosecuting Airman Barnhill leaves little doubt that he hoped thereby "to get him to talk." Indeed, we have been made aware that such administrative procedures have been used in order to avoid trial under the Uniform Code. Cf. concurring opinion of Chief Judge Quinn, United States v Phipps, 12 USCMA 14, 30 CMR 14.

In United States v Dalrymple, 14 USCMA 307, 34 CMR 87, we recently pointed out, at page 310:

"Undoubtedly, if an accused is promised immunity from prosecution in return for a confession to crime, such would, as a general proposition, operate to deprive him of the mental freedom to choose either to speak or to remain silent and thus render his statement involuntary. United States v Johnson, 5 USCMA 795, 19 CMR 91; United States v Howell, 5 USCMA 664, 18 CMR 288; Shotwell Mfg. Co. v United States, 371 US 341, 9 L ed 2d 357, 83 S Ct 448 (1963). The question of voluntariness is one of fact and a 'confession must be the product of free choice— of a will not encumbered or burdened by threats, promises, inducements, or physical or mental abuse.' United States v Colbert, 2 USCMA 3, 7, 6 CMR 3, 7. . . .'"

In that case, we believed it reasonably possible for the court-martial to have found that the accused confessed because of repeated assurances his case was not to be prosecuted and that a statement was needed only to complete the investigator's files. So also in this case do we believe it open to the fact finders to have concluded that accused, having denied his guilt for a period of three days was finally persuaded to confess—even against advice of counsel—by the threat of receiving more severe punishment at the hands of civil authorities for his lack of cooperation and the alleged assurance that confessing his guilt would result in no prosecutory impediment to his already pending administrative discharge. Turning to the president's instructions,

however, we find no attempt to relate the defense theory of involuntariness and the evidence supporting it to the applicable law. Rather, there was only a mention of abstract factors as bearing on involuntariness and the conclusional statement that such would render the statement improperly obtained if "the accused was deprived of his mental freedom to choose to remain silent or to make a statement." Yet, we have consistently set forth the need to tailor applicable legal principles to the factual controversy presented. United States v Acfalle, 12 USCMA 465, 31 CMR 51; United States v Smith, 13 USCMA 471, 33 CMR 3. Moreover, at no time did the president submit to the court the issue of voluntariness as it related to the tools and toolbox, although, upon this record, it must be conceded that their location and use in evidence was the direct product of the accused's statement to Grimes. United States v Askew, 14 USCMA 257, 34 CMR 37. In short, as we there said, at page 263, the instructions provided "no meaningful submission to the court-martial of the questions involved."

Nevertheless, the Government contends that the decision of the board of review should be affirmed. First, it argues that the evidence of guilt *aliunde* the confession is compelling and that the error was, therefore, harmless. Cf. Code, supra, Article 59, 10 USC § 859. But that principle has never been applied to issues of involuntariness. United States v Wilson, 2 USCMA 248, 8 CMR 48. In Rogers v Richmond, 365 US 534, 5 L ed 2d 760, 81 S Ct 735 (1961), the Supreme Court pointed out, in remanding the case for a new trial under proper instructional principles concerning the methods by which defendant's confession was obtained, that the law was concerned here not with the truth of the statement but with the violation of due process involved when the State "by coercion prove[d] its charge against an accused out of his own mouth." Rogers v Richmond, supra, at page 541. We likewise decline to affirm on the basis of other evidence presented to the court when it appears that the question of involuntariness was not submitted under proper instructions.

Secondly, the Government urges that, under our decision in United States v Acfalle, supra, tailoring of instructions is required only when the measures used by the investigators bear some semblance of legality and the court members might be unaware of the need to scrutinize them in relation to the confession. Such, indeed, was a factor in *Acfalle,* supra, in light of the facts there presented, but it is not the test for determining the adequacy of the instructions. Rather, what is required in every case, as we have on many occasions reiterated, is a meaningful submission of the interrelationship between the evidence and the law to the court-martial. United States v Askew; United States v Smith; United States v Acfalle, all supra. We accordingly reject the Government's limited construction of the principle which is applicable here.

In sum, then, the state of the proof in this record constrains us to hold that a strong issue of voluntariness was raised for the resolution of the court-martial. The president erroneously failed to submit this question in any meaningful way to the members. United States v Askew; United States v Smith; United States v Acfalle, all supra. We are determined that issues shall be so presented, as is customary in all judicial proceedings. Under the circumstances here depicted, the error was prejudicial. Rogers v Richmond, supra; United States v Askew, supra.

The decision of the board of review is reversed, and the record of trial is returned to The Judge Advocate General of the Air Force. A rehearing may be ordered.

Chief Judge QUINN and Judge KILDAY concur.