UNITED STATES, Appellee

v

JACK B. HOUSTON, Airman Basic,
U. S. Air Force, Appellant

15 USCMA 239, 35 CMR 211

No. 17,902

February 26, 1965

*Lieutenant Colonel Joseph B. McMullin* argued the cause for Appellant, Accused. With him on the brief was *Colonel Robert O. Rollman.*

*Major Thomas J. Connolly* argued the cause for Appellee, United States. With him on the brief was *Colonel Emanuel Lewis.*

## Opinion of the Court

FERGUSON, Judge:

Tried by general court-martial con-vened at McChord Air Force Base, Washington, by the Commander, 25th

Air Division (SAGE) (ADC), the accused was found guilty of eleven specifications of larceny, in violation of Uniform Code of Military Justice, Article 121, 10 USC § 921, and an Additional Charge and specification in violation of the same Article. He was sentenced to dishonorable discharge, forfeiture of all pay and allowances, and confinement at hard labor for two and one-half years. The convening authority, setting aside some of the findings of guilty, approved only so much of the sentence as provided for the punitive discharge, forfeitures, and confinement at hard labor for two years. The board of review affirmed, and we granted accused's petition for review upon the issue:

"Whether the instructions on voluntariness (R. 196) were sufficiently tailored to the defense claims of administrative segregation and/or confinement for several days; prolonged and repeated questioning; threats of involvement in a civil burglary; denial of counsel; and threats to question the girl friend of the accused."

I

Following introduction of evidence tending to establish the commission of the crimes alleged in the various specifications,[1] the prosecution successfully sought the admission of two written statements by the accused, in which he confessed his guilt, over objection by defense counsel that such were involuntarily obtained. We limit our recitation of the evidence to that supporting and opposing this defense contention, bearing in mind that it is incumbent upon the United States to establish the voluntariness of every confession upon which it relies beyond a reasonable doubt. United States v Odenweller, 13 USCMA 71, 32 CMR 71.

Accused was apprehended by Air Police at approximately 8:30 a.m., on December 1, 1963, on suspicion of burglary, and taken to Air Police Headquarters. As he had a gash on his head, inflicted on some previous occasion, he was taken to the Base dispensary for medical treatment. Upon his return to Air Police Headquarters, he was interrogated by investigators concerning various larcenies which had occurred on the base.

According to Staff Sergeant Dunn, accused's interview commenced at about 9:30 a.m., and was preceded by the required warning under Code, supra, Article 31, 10 USC § 831, which Houston affirmatively indicated he understood. Accused then consented to a search of his quarters and belongings. Upon completion of the search, he and the investigators returned to the police station, and interrogation was commenced, after he was again advised of his rights. He denied accusations made against him and was turned over to a police patrol in order that he might eat the noon meal. At about 1:00 p.m., Houston came back to the station, and his questioning was resumed, following another, more thorough search of his quarters. This period of interrogation resulted in accused's making a statement to Dunn's partner, Sergeant Buchheit, which was written out in longhand. Accused signed it, as did the two investigators. On the following day, accused signed a typed copy of this statement. No force, threats, promises of immunity, or coercive measures were used by Dunn in order to obtain this statement.

On December 3, 1963, Dunn again interrogated accused about the details of his alleged offenses, the questioning lasting for approximately one hour. Accused was given an appropriate preliminary warning on this occasion also. A lineup involving the accused was conducted on December 4, but he was not questioned that day. On December 5, 1963, accused was again interrogated, and after "say no more than 10 minutes of the interrogation, the subject stated that he would like to make this statement. It was his idea, about the second statement." On the same day, this confession was also reduced to writing

[1] The issue before us does not concern the Additional Charge and its specification, which involves a larceny occurring on January 9, 1964, several weeks after his statements had been obtained by the Air Police.

and signed by the accused, with the investigators acting as witnesses.

Sergeant Dunn conceded accused was also asked if he was involved in a burglary in Olympia, Washington, and Sergeant Buchheit made a statement in another concurrent "case against the accused . . . that civil authorities would be called in to check a particular female out in Tacoma." The "deal on Olympia," including the reference to questioning accused's girl friend, "was brought out, not mainly concerning this case but to see who was involved in the burglary from McChord and to see if we could get information we could report as Air Police." Dunn declared he could not remember the accused asking if he could see Lieutenant Schmidt, his trial defense counsel, during the interrogation.

Sergeant Buchheit testified he assisted Staff Sergeant Dunn in the investigation and interrogation of the accused. He denied making him any promises of immunity, special treatment, or in any way using duress or coercion in order to obtain a statement. He took the confession from accused on December 1, saw him briefly in order to obtain his signature on the typed copy on December 2, unsuccessfully sought a more complete statement on December 3, participated in the lineup with him and Sergeant Dunn on December 4, and witnessed part of the interview of the accused and the signing of the typed statement on December 5. He recalled that accused, on the morning of December 3, expressed the desire to see Lieutenant Schmidt, and that, during his questioning, mention was made of accused's alleged connection with a burglary at Olympia, Washington. No comment was made with reference to accused's girl friend, except that Houston stated he had some clothes at her apartment.

At the time of the interrogation, Sergeant Buchheit did not know who Lieutenant Schmidt was, nor did he inquire concerning his identity. Houston declared that "he would like to speak to Lt Schmidt . . . that he requested through confinement facilities

to see Lt Schmidt." Sergeant Buchheit explained further:

"Sir, the way I understood it was that the Lieutenant was the man that was working on his [administrative] discharge. He said he was due to get out shortly, out of the service, and Lt Schmidt or somebody was having psychiatric treatment for him at Madigan, and at that time I could not make any connection as to what Lt Schmidt would have to do with this investigation. I thought this strictly pertained to his discharge.

• • • • •

". . . I did not understand it to be a request [for counsel]."

During the first two weeks of his incarceration, according to the non-commissioned officer in charge of confinement, accused did not execute the form needed to request an interview with counsel, nor did he make a verbal request to see an attorney during the period December 1–5, 1963. During this time, accused was confined in the administrative segregation cell, and was quite frequently taken upstairs for interrogation by the Air Police. The cell in which accused was confined was smaller than usual and was normally used for punitive purposes. However, accused was placed in it in order to comply with regulations requiring his separation from other prisoners undergoing correctional custody and was not there in order to punish him. When accused finally requested counsel orally, his desire was honored.

An Airman Bernathy testified that, while acting as confinement supervisor, accused on several occasions obtained from him the forms necessary to obtain an interview with individuals outside the confinement facility. Accused returned completed forms to him, and he delivered them to the desk of the non-commissioned officer in charge of confinement. Bernathy, however, could not recall whether such occurred during the first week of accused's confinement or later.

Accused elected to testify concerning the circumstances surrounding the taking of his confessions. He declared that, at the outset of his initial inter-

242

rogation by Sergeant Dunn, "I told him I wanted to see a lawyer first, which was Lt Schmidt." Dunn "said—just go ahead and tell me what you can and we will do the best we can, that actually it was not his job to do so but he would tell confinement, let them know." During the questioning, Dunn accused him of stealing items not involved in the charges, mentioned accused's alleged involvement in a burglary in Olympia, and threatened to interrogate his girl friend, saying "he would ask her about the theft and maybe she was spending the money I had been taking and that she'd have some of the things I had stolen." When accused was first cleared into confinement, he "asked to see a lawyer," and the supervisor, Sergeant Surro, said, "I will try to get you one after dinner." Counsel, however, was not made available to him.

During the first week of his confinement, accused again sought an appointment to see Lieutenant Schmidt, and filled out the necessary form. He turned it over to Airman Bernathy, who placed it on the desk of the noncommissioned officer in charge. There was no response to this request, and no one sought to ascertain from him who Lieutenant Schmidt was. Again, on December 5, accused told Sergeant Dunn he wished to see Lieutenant Schmidt before signing his statement, but Dunn did not arrange for him to do so. Accused "definitely" would not "have signed these statements if it had not been for the fact . . . [he was] confined in administrative segregation for approximately 5 days and the fact that Sgt Dunn attempted to involve . . . [him] in the burglary in Olympia, threatened to question . . . [his] girl friend, and did not afford . . . [him] the right to see . . . [his] attorney."

According to Sergeant Surro, upon accused's entry into confinement, he made no request to see anyone. While denying he had any animosity toward the accused, Surro admitted that "in jesting conversation," he told accused he hoped "he gets 5 years."

Following the receipt of this evidence, the law officer admitted accused's

two confessions in evidence, but instructed the court-martial as follows:

"The court is advised that my rulings receiving in evidence Prosecution Exhibits 4 and 5, the out-of-court statements of the accused, with respect to the charges and specifications before the court, is final only on the question of admissibility. My ruling merely places the statement before the court. It does not establish the voluntary nature of the statements for each of you, in your deliberations upon the findings of guilt or innocence, must come to your own conclusions as to the voluntary nature of the statements. You may accept the statements as evidence only if you determine beyond reasonable doubt that they were voluntary. Otherwise, you must reject the statements and disregard them as evidence in the case. You are instructed in this connection that the out-of-court statements of the accused are not voluntary if they were obtained from the accused through the use of coercion, unlawful influence, or unlawful inducement. You are also advised that even if you determine beyond reasonable doubt that the statements were voluntary, you should consider the evidence which has been presented regarding voluntariness in determining the weight you will give to the statements.

"There has been evidence adduced that prior to the making of the out-of-court statements the accused was subjected by his interrogators to certain treatment which may have been the effective cause of his making such statements. The fact that the accused was interrogated for an extended period of time, or otherwise subjected to treatment which may have been the effective cause of his making such statements, is a matter which you must consider in your determination as to whether the statements were voluntarily made. If, after considering these matters and all the other evidence which touches on the voluntariness or involuntariness of the statements, you do not determine beyond a reasonable doubt that the statements were voluntary,

then you must reject the statements and disregard them as evidence.

"Evidence has also been presented which places in issue the question of whether during interrogation of the accused he requested but was denied the opportunity of consulting with legal counsel. If the accused requested and was denied his right to consult counsel, you must refuse to consider his statements.

"Consequently, unless you find beyond reasonable doubt that accused was not denied the right to consult with counsel after he had requested the aid of counsel, you must reject the accused's statements and give them no weight whatsoever.

"Now, further in this regard, the court has 2 statements before it. The court, in assessing the weight that they will give to each of these statements, should consider them independently of each other. Thus, you may arrive at one conclusion with regard to one of the statement [sic], and possibly another conclusion with regard to the other statement."

Subsequently, accused elected to testify on the merits of the case and fully repudiated his confessions, declaring they were not the product of his own free will, but the result, in part, of being told "they would go lighter on me in court if I cooperated and [that] . . . they would try to do all they could to help me." Thereafter, the law officer repeated the instructions on the effect of his ruling admitting the confessions in evidence and the duty of the court with respect thereto.

## II

The law officer determined that the foregoing evidence raised issues of voluntariness and denial of counsel with respect to both statements. We fully agree that a substantial foundation existed for his conclusion. Thus, there was testimony by the accused that he was motivated to confess by the investigators' inquiries concerning an alleged burglary in which the civil authorities were interested; references to his girl friend which he understood

as threats to involve her, and which were capable of that interpretation; confinement during the period of his interrogation in a cell used normally for purposes of punishment of stockade inmates; repeated failures on the part of the agents and confinement personnel to permit him access to legal advice from Lieutenant Schmidt, who was then representing him in connection with administrative discharge board proceedings; and persistent questioning over a five-day period. We have held each of these factors affects voluntariness and may constitute a basis, either singly or in combination, to justify the fact finders in entertaining a reasonable doubt as to whether a confession is the product of its maker's free will.

In United States v Tanner, 14 USCMA 447, 34 CMR 227, we pointed out that threat of prosecution by civil authorities was a matter which impinged upon the accused's freedom to speak or remain silent. Likewise, in United States v Askew, 14 USCMA 257, 34 CMR 37, we condemned the investigatory tactic of playing upon an accused's emotions and desire to avoid his wife's entanglement with the police. While the Government intimates a different result should occur in the case of a sweetheart or paramour, we find no reason for such a distinction. Utilizing friendship alone as a means of placing accused in an emotional state and thereby securing a confession of his guilt may amount to impermissible psychological coercion. Spano v New York, 360 US 315, 3 L ed 2d 1265, 79 S Ct 1202 (1959). It is not the legality of the relationship but the storm aroused by its nature "which deserves mention in the totality of the situation." Id., 360 US, at page 323. See also, concurring opinion, United States v Walbert, 14 USCMA 34, 33 CMR 246.

So also may confinement of the nature here depicted serve to affect the free choice to remain silent which must remain with the accused if his statement is to be received in evidence and utilized by the court. United States v Walker, 9 USCMA 187,

244

25 CMR 449; United States v Moore, 4 USCMA 482, 16 CMR 56; United States v Acfalle, 12 USCMA 465, 31 CMR 51; but see United States v Fair, 2 USCMA 521, 10 CMR 19, at page 529. And while interrogation is not inherently coercive, see United States v Moore, supra, its length, duration, and nature, are indubitably to be considered in determining voluntariness. United States v McCartney, 11 USCMA 3, 28 CMR 227; United States v Walker, supra.

Finally, as we have pointed out on many occasions, if an accused during the investigative process ■■■■■■■ ■ requests an opportunity to consult with counsel and is denied such, statements thereafter obtained from him in the investigation are inadmissible in evidence. United States v Gunnels, 8 USCMA 130, 23 CMR 354; United States v Rose, 8 USCMA 441, 24 CMR 251; United States v Wheaton, 9 USCMA 257, 26 CMR 37. As we declared in United States v Brown, 13 USCMA 14, 32 CMR 14, at page 17:

> "The law is clear under the cases previously cited that when an accused or suspect requests such information it is error to misadvise him of his right to consult with an attorney and 'force him to submit to questioning . . . without a lawyer.' *Gunnels,* supra, at page 135. If the accused seeks to exercise his right to consult with counsel during interrogation he must be afforded the opportunity to do so."

To the same effect, see Escobedo v State of Illinois, 378 US 478, 12 L ed 2d 977, 84 S Ct 1758 (1964).

Here, the evidence is clearly sufficient to raise an issue for the court concerning whether accused, during the interrogative process, sought the assistance of legal counsel. According to his testimony, at the outset of the questioning, he informed Sergeant Dunn he "wanted to see a lawyer first, which was Lt Schmidt"; that he orally sought the same assistance from Sergeant Surro; and that he, on many occasions, filled out the requisite re-quest forms while in confinement in order to contact Schmidt, then representing him before an administrative discharge review board. Yet, he was allegedly unsuccessful in all his efforts until several weeks following the execution of both his statements. Some of his testimony is corroborated by that of Airman Bernathy, and other parts of it are supported by the answers of one of his interrogators, Sergeant Buchheit, although the latter testified he did not understand accused in discussing the matter with him to be making an actual request to see an attorney. Nor, in this connection, is the dichotomy between the testimony of Sergeant Dunn and Sergeant Buchheit, as to whether the accused mentioned the matter at all, without significance. In short, in the state of the record before us, it was clearly open to the court members to find that Houston, from the outset of his interrogation, sought the assistance of counsel and such was denied him through the simple device of ignoring his importunities. Compare Escobedo v State of Illinois, supra.

That there is evidence on the other side of the question cannot be gainsaid, but it is not open to this Court or any appellate authority to "apply the law . . . to the evidence . . . and resolve all factual issues . . . against the accused." United States v Black, 12 USCMA 571, 31 CMR 157; United States v Kuefler, 14 USCMA 136, 33 CMR 348; United States v Singletary, 14 USCMA 146, 33 CMR 358; United States v Moore, 15 USCMA 187, 35 CMR 159. All that we need determine is whether there is in the record evidence to support the law officer's initial determination that the question was in issue and, in consequence, that he did not abuse his discretion in advising the court thereon. United States v Morphis, 7 USCMA 748, 23 CMR 212. We find this standard fully met here, and the question of voluntariness of accused's statements was reasonably in issue.

### III

Turning to the question of the sufficiency of the instructions regarding

voluntariness, we find nothing more than reliance by the law ▆▆▆▆▆▆ ■ officer upon "the terms of an instructional form book . . . to the exclusion of the effect of the evidence and any explanation of the legal problems involved, as placed in issue by that proof." United States v Moore, supra, page 196. The law officer did no more than refer to "evidence . . . that . . . the accused was subjected . . . to certain treatment," without pretending to delineate such "treatment" or inform the court as to the result which must flow from its findings of fact regarding the specific allegations leveled at the air police officers. Moreover, at no place in his advice did the law officer refer to the governing legal principle involved in all contests on involuntariness of a confession, i.e., that the statement "must be the product of free choice—of a will not encumbered or burdened by threats, promises, inducements, or physical or mental abuse." United States v Colbert, 2 USCMA 3, 7, 6 CMR 3, 7; United States v Askew, supra, at page 261; Shotwell Mfg. Co. v United States, 371 US 341, 347, 9 L ed 2d 357, 83 S Ct 448 (1963). In this respect, the instructions are even more deficient than those which we held prejudicially insufficient in United States v Tanner, 14 USCMA 447, 34 CMR 227. And here, as there, "we find no attempt to relate the defense theory of involuntariness and the evidence supporting it to the applicable law." Id., at page 451; United States v Moore, supra. We reiterate our view that there must be a meaningful submission of the interrelationship between the evidence and the law to the court-martial, and find the failure to do so here was prejudicially erroneous. United States v Askew, supra; United States v Tanner, supra; United States v Acfalle, supra; Rogers v Richmond, 365 US 534, 5 L ed 2d 760, 81 S Ct 735 (1961).

The decision of the board of review is reversed, and the record of trial is returned to The Judge Advocate General of the Air Force. The board of review may reassess the sentence on the basis of the Additional Charge and its specification or order a rehearing on the original charge, its specifications and the penalty.

Judge KILDAY concurs.

QUINN, Chief Judge (dissenting):

I disagree with a number of the implications of the principal opinion. For example, I do not construe the Tanner case, 14 USCMA 447, 34 CMR 227, as resting merely on an alleged threat of prosecution by civilian authorities. The threat was that the accused would be subject to greater punishment, and would not be separated from the service by way of a pending administrative discharge if he did not cooperate by making a statement. The joinder of the threat of civilian prosecution with the idea of greater punishment is evident from the following excerpt from the opinion in that case:

". . . [W]e believe it open to the fact finders to have concluded that accused, having denied his guilt for a period of three days was finally persuaded to confess—even against advice of counsel—by the threat of receiving more severe punishment at the hands of civil authorities for his lack of cooperation and the alleged assurance that confessing his guilt would result in no prosecutory impediment to his already pending administrative discharge." [Id., at page 450.]

In United States v Askew, 14 USCMA 257, 264, 34 CMR 37, I questioned whether a promise not to interrogate a third person is an improper influence in considering the voluntariness of a pretrial statement by the accused.

Also, I disagree with the conclusion of the principal opinion that the instructions in this case were not sufficient to present properly to the court members the issue of voluntariness. The evidence dealing with voluntariness could reasonably be divided into two broad classes, namely, the conditions under which the accused was interrogated and his request for counsel. The law officer recognized the divisibility of the evidence, and instructed the court-martial as to both situations. In

246

regard to the conditions of interrogation, he expressly advised the court-martial that:

". . . The fact that the accused was interrogated for an extended period of time, or otherwise subjected to treatment which may have been the effective cause of his making such statements, is a matter which you must consider in your determination as to whether the statements were voluntarily made. If, after considering these matters and all the other evidence which touches on the voluntariness or involuntariness of the statements, you do not determine beyond a reasonable doubt that the statements were voluntary, then you must reject the statements and disregard them as evidence."

As to the accused's request for counsel, he specifically presented this issue to the court-martial as follows:

"Evidence has also been presented which places in issue the question of whether during interrogation of the accused he requested but was denied the opportunity of consulting with legal counsel. If the accused requested and was denied his right to consult counsel, you must refuse to consider his statements."

In my opinion, the law officer did not have to go beyond his presentation of the broad issues and detail the specific evidence that came under each heading. I would, therefore, affirm the decision of the board of review.