UNITED STATES, Appellee

v

LINDSEY L. GREEN, Private, and ROBERT T. HAMILTON,
Private, U. S. Army, Appellants

15 USCMA 300, 35 CMR 272

*Captain Clifford B. Hearn, Jr.*, argued the cause for Appellants, Accused. With him on the brief were *Colonel Joseph L. Chalk* and *Lieutenant Colonel Jacob Hagopian.*

*First Lieutenant William W. Nelson* argued the cause for Appellee, United States. With him on the brief were *Colonel Edwin G. Schuck* and *Lieutenant Colonel Francis M. Cooper.*

## Opinion of the Court

FERGUSON, Judge:

Arraigned and tried before a general court-martial convened at Fort Hood, Texas, upon charges of larceny and wrongful destruction of private property, in violation of Uniform Code of Military Justice, Articles 121 and 109, 10 USC §§ 921, 909, respectively, Privates Green and Hamilton were found guilty. Hamilton was sentenced to dishonorable discharge, forfeiture of all pay and allowances, confinement at hard labor for two years, and reduction. Green was similarly punished, except that the term of his confinement extended only to one year. The convening authority approved both penalties, but the board of review, otherwise affirming, reduced Hamilton's imprisonment to one year and that of Green to nine months. We granted their petition for review upon the issues:

"1. Whether the confessions of the accused, made after the 'bugged room episode' were inadmissible on the basis of an implied promise of confidentiality as to the conference between the two accused.

"2. Whether the law officer erred prejudicially in failing to mention the issue of confidentiality of the conference between the accused as being a factor which, if it resulted in their later confession, would render such statements inadmissible."

I

The matter before us arose in the following manner. Certain soft drink machines at Fort Hood were broken open and cash removed from them. The two accused came under suspicion and were brought to the local Criminal Investigations Detachment Office, where they were advised of their rights under Code, supra, Article 31, 10 USC § 831, and the nature of the investigation. While the evidence is extremely confused, particularly with reference to the dates involved, it appears that on this initial occasion, neither accused made any statement in connection with the offenses. It also appears, however, that, shortly thereafter, on October 8, 1963, accused Green, after proper warning under Code, supra, Article 31, made a written statement to Investigator McDonald, in which he partially delineated his criminal responsibility.

The two accused were returned to the Criminal Investigations Detachment Office, apparently on October 9, 1963, and it is the statements made on this date with which we are directly concerned. Upon their arrival at the office, the two men were placed in a waiting room, where they remained until Green was called upstairs for further interrogation by McDonald.

According to McDonald, the accused "asked if they could speak to one another alone and they was put into a room and where they both could speak to each other and they was spoke to in this room." McDonald led the accused to believe "that they would not be overheard." However, the room which was furnished for their conversation was equipped with a two-way mirror and electronic equipment whereby it

was possible to overhear and record statements made therein. By this means, McDonald overheard the information revealed by the two men. After their talk ended, "they was separated and one was brought back down to the room where I used for an office and they was read Article 31 again, sir. And he was questioned and then he was told that I overheard everything that they said and what they had planned and a statement was given then, sir." Thereafter, the "other one was brought up and then he was read Article 31 and he was questioned and he was told the same thing. And his statement was given, sir." In McDonald's opinion, the fact he had overheard the accused's conversation and disclosed such to them was "part of" the reason why they confessed their guilt to him.

Not unsurprisingly, the testimony of the two accused differs from that of the investigator. Hamilton conceded he had been advised of his rights under Code, supra, Article 31, but alleged that, on the day in question, after Green had returned from McDonald's office, he, too, was called upstairs and interrogated. McDonald confronted him with a purported statement which Green had allegedly made, and asked him if he was ready to confess. When Hamilton denied the truth of the statement, he was asked if he wished to see Green, and replied affirmatively. The two men were placed in the "bugged" room and conversed with each other, without knowing they were being overheard. At the end of their talk, Hamilton was returned to McDonald's office, and Green was again sent downstairs to wait.

When Hamilton once more refused to confess his guilt, McDonald demonstrated to him that the room in which he had talked with his co-accused was "bugged," and told him what he had overheard. The investigator then allegedly declared that Hamilton could " 'write out a lie if you want to,' " but that he had two witnesses to the conversation with Green. " 'I'll write out mine and get my two witnesses to sign it and I'll use it in a trial by court-martial against you.' " Hamil-

ton "would not have talked to Green in the room" if he had known it was "bugged," and ultimately confessed to McDonald, "[b]ecause he told me that —all about what we had said in the room . . . seeing . . . that he knew so much and he had already told us about his two witnesses, so I just went on and made out a confession."

Green testified he "was waitin' downstairs and Hamilton went upstairs." Later, McDonald sent for him and met him at the top of the stairs. He asked Green if he wished to talk with Hamilton. Green "said, 'No.' And so he said, 'You sure?' And I said, 'Okay.' And so we went on down the hall and he took us into this little room."

Green, too, was unaware that the room was "bugged" or that his conversation with Hamilton was being overheard. After it was terminated, he was sent back downstairs while McDonald talked with Hamilton. Upon being recalled by the investigator, he was informed, " 'Now you don't have to make a statement, because we've got you dead to rights.' He said, 'You can make a statement if you want to, or I can make a statement and my two witnesses can sign it.' And after this I thought for a few minutes, and with what he already knew, I might as well make it." Green was also told that "I couldn't get any more than six months and a special court-martial." Green felt McDonald "had us dead to rights" because of overhearing the conversation, and he "was twisting my arm . . . mentally, sir." It should also be noted McDonald specifically denied mentioning to either accused any possibility of the forum in which they might be tried, attempting to use a false confession by Green against Hamilton, or that he in any manner sought to persuade the two accused to talk together in order that he might overhear them.

The law officer overruled defense objections to receipt of the accused's statements, based, *inter alia*, upon the ground that the agent had led them to believe they were conversing in private and thereafter obtained their con-

302

fessions on the basis of a threat to use their supposedly confidential declarations to each other against them. Thereafter, he advised the court concerning the effect of his ruling and the members' responsibility in the premises, delineating the legal effect of the evidence regarding some of the factors concerning which the accused testified, none of which are relevant to the issue before us. As to that question, he charged them:

"Also, the interrogators may use certain techniques and strategies in obtaining a statement. And if this statement is obtained as a result of this, it does not mean that it is inadmissible. But if the tactics used are such as to overcome the free will of the particular individual, then the statement cannot be considered as voluntary. It must be such that the confessor is not denied his mental freedom to remain silent before you can consider it. And, as I said before, before you can consider any statement, any of these statements, you must be convinced beyond a reasonable doubt that they were in fact voluntary."

## II

The first question which we are called upon to decide is whether the alleged tactics of the agent in leading the two accused to believe they could converse with each other in confidence; eavesdropping on them; and utilizing the information which he thereby learned to obtain confessions from them, renders such statements inadmissible as a matter of law. We cannot say his behavior requires such a conclusion, when the record reflects, through the testimony and contention of the accused themselves, that they may have been led to confess by other matters, such as an alleged promise to secure their trial by special court-martial, all of which were specifically denied by the agent in his testimony and properly submitted by the law officer to the court members. In short, in order to be inadmissible as a matter of law, a confession must have been caused by the allegedly un-

lawful strategem used, and, on this record, we cannot conclude that such was the case to the exclusion of the other matters mentioned by Green and Hamilton. Cf. United States v Howell, 5 USCMA 664, 18 CMR 288. Nevertheless, it is clear the evidence placed in issue the admissibility of the confession and presented a question of fact for the decision of the law officer and the members of the court concerning whether the advice of the accused regarding their right to remain silent had been improperly vitiated.

The Government argues that it is perfectly permissible to leave two defendants alone with each other for the purpose of conversing with each other regarding the subject of their detention and thereafter to listen in on their conversation and utilize the information gained in order to secure confessions from them. It relies upon decisions to that effect in People v Ketchel, 59 Cal 2d 503, 381 P2d 394 (1963), and Commonwealth v Turner, 371 Pa 417, 88 A2d 915 (1952). This contention may be correct, but it overlooks the requirement in the armed services that an accused be advised of his rights under Code, supra, Article 31; the fact that there is evidence in this record tending to indicate the interrogating agent, McDonald, led the accused to believe their conversation would be in confidence; that he thereafter used the information which he obtained through his eavesdropping to secure their confessions; and that we have long held the effect of the warning under the Code may not be eliminated by leading an accused to believe a statement which he makes will not be used against him.

Thus, in United States v Cudd, 6 USCMA 630, 20 CMR 346, Judge Latimer declared at page 634:

"To make my position certain, I inveigh forcefully against the practice of having a Government agent who is conducting an official investigation warn an accused person that any statement he makes can be used against him in a court-martial and then destroy the effect of that statement by a subsequent declaration

that any statement made will be considered secret. For all practical purposes, that amounts to no warning, as the assurance could only be interpreted to mean that the statement would not be used in a subsequent trial."

So also, in United States v Washington, 9 USCMA 131, 25 CMR 393, we stated, at page 132:

". . . We all agree that a statement is inadmissible, despite advice to the accused of his rights under Article 31 of the Uniform Code, 10 USC § 831, if the accused is informed at the time of the advice by a competent person that whatever he says will be held in confidence between them. A representation of that nature tends to induce a belief in the mind of the accused that his disclosure will *not* be made the basis for a criminal prosecution."

See also United States v Haynes, 9 USCMA 792, 27 CMR 60, and United States v Dalrymple, 14 USCMA 307, 34 CMR 87.

The United States concedes the validity of the concept laid down in these cases, but contests its applicability to the situation before us on the ground that there is "no showing . . . made that McDonald ever told either appellant that what they might say to each other would be held in confidence by him." Literally speaking, this may be true, but, pragmatically, the opposite conclusion must be reached. There is no doubt McDonald did not directly say he would hold the accused's disclosures to each other in confidence, but there is evidence which indicates clearly he informed them they might speak to each other in *confidence, i. e.,* no one would overhear their conversation at all. · The obvious purpose of such an assurance would be to lead the accused to believe their discussion would not be used against them at all and thus, as to their conversation, to vitiate the prior advice which had been given them under the provisions of Code, supra, Article 31. And, thereafter, the accused were allegedly told that this conversation—previously supposed by them to have been in

private—had been overheard and, supported by two other witnesses, would in fact be used at their trial if they did not make an additional disclosure of their guilt. As we said in United States v Haynes, supra, at page 794, of a similar situation:

"The ramifications of permitting the use of evidence under these circumstances are dire in the extreme. It would in effect be permitting the Government to do indirectly what is forbidden by Article 31(a), Uniform Code of Military Justice, 10 USC § 831, to do directly. If such receive our sanction there would be nothing to prevent Government agents from procuring information—such as the identity of hostile witnesses, or the location of incriminating property—from the accused by the use of force or other unlawful means and then simply rest the prosecution's case upon the evidence procured through those statements without introducing the statements themselves into evidence at all."

In *Haynes,* supra, the evidence involved was likewise obtained as the result of statements made to an agent that whatever the accused said would be held in confidence. Here, the statements were allegedly obtained by the agent as a result of leading the accused to believe they could converse with each other privately and then using such to lever additional confessions from them. The only distinction which we find is that McDonald told each of the defendants, not that what they said to him would be confidential, but that what they said to each other would have that seal. In our view, this difference is without legal significance as regards the question of destroying in their minds the effect of the required advice under Code, supra, Article 31. While, indeed, as the Government contends, this was trickery, it was also something more, namely, leading the accused to believe their talk would not be used against them. United States v Cudd, supra; United States v Washington, supra. If such be found to be the causative factor for their later confessions, then the

304

latter would not be admissible in evidence against them. United States v Haynes, supra. While we cannot, in light of the transcript now before us, conclude this, as a matter of law, was the conclusion which should have been reached by the law officer, we are satisfied a clear issue was presented for the resolution of the fact finders.

### III

The second issue before us involves the sufficiency of the law officer's instructions regarding voluntariness. While he chose generally to follow the standard form of advice with regard to this question, he did also characterize most of the factors concerning which the accused testified as affecting the exercise of their wills in executing the statements in question. However, he made no mention of the effect of express or implied promises of confidentiality *vis a vis* the necessity of an adequate and appropriate warning under the provisions of Code, supra, Article 31. To the contrary, he informed the court members, as set out above, regarding the use and effect of "certain techniques and strategies in obtaining a statement."

Under the circumstances, we necessarily conclude the advice was prejudicially deficient. It imposed no duty upon the court members to find whether the effect of the requisite warning to the accused had been vitiated by the alleged promise to permit them a conference in private and the use thereafter of the information obtained by eavesdropping in order to secure their statements. United States v Cudd, supra; United States v Haynes, supra. Not only did it mistakenly pin the use of trickery by investigators to the issue of coercion rather than the need for a proper and effective advice under Code, supra, Article 31, but it clearly indicated that "techniques and strategies" by agents were permissible unless they were in fact coercive. It is apparent, therefore, that the instruction served to place the hounds on the wrong scent. Cf. United States v Moore, 15 USCMA 187, 35 CMR 159; United States v Tanner, 14 USCMA

447, 34 CMR 227. What was required was a delineation by the law officer of the effect of the particular tactics employed by McDonald in securing the confessions on the prior warning under Code, supra, Article 31, provided that the court members found such to have been used from the evidence presented, and whether such caused the statements admitted in evidence to be made. United States v Tanner, supra; United States v Acfalle, 12 USCMA 465, 31 CMR 51; United States v Smith, 13 USCMA 471, 33 CMR 3. His failure so to advise the members, coupled as it was with the generalized advice regarding the use of trickery and artifice, offered no meaningful submission of the issue to the fact finders, and constituted prejudicial error.

In sum, then, we hold that an issue was raised as to whether the agent involved led the accused to abandon their right to remain silent by informing them their statements to each other would be held in confidence and then utilized the information which he thus obtained to cause them to confess their guilt. This question was never properly submitted to the court members by the law officer, and the absence of such submission leads us to reverse. We emphasize, however, that we deal not, as do the authorities cited by the Government, with mere trickery or subterfuge, but with warning the accused regarding their rights under Code, supra, Article 31—an advice required to be delivered effectively by both the decisions of this Court and the command of the Congress.

The decision of the board of review is reversed and the record of trial is returned to The Judge Advocate General of the Army. A rehearing may be ordered.

Judge KILDAY concurs.

QUINN, Chief Judge (dissenting):

The majority equates the erroneous belief of the accused that their conversation in a closed room would not be overheard, with a promise that they could talk to each other without police interference. Agent McDonald flatly denied any promise of confidentiality. His testimony is as follows:

"Q. [DC] Did you tell them they could go to the room where they could speak in confidence?

"A. No, sir, they asked if they could speak to each other, and I told them—I took them to the room and let them do so, sir."

All that is present here is a simple situation in which a police officer matched wits with the accused and beat them. There is no question of the violation of any constitutional privilege of the accused; no question of a violation of any of their rights under Article 31 of the Uniform Code of Military Justice, 10 USC § 831; and no evidence of a promise of privacy. According to the accused Hamilton, his meeting with Green came about as a result of a maneuver by McDonald. He testified McDonald showed him an unsigned writing which he implied was a confession by Green. Hamilton read the writing. He immediately recognized the handwriting was not that of Green, and he "started to tell" McDonald that, but, instead, he said, " 'Well, this is not true.' " McDonald asked if he would like to talk to Green about the statement. He replied, " 'Yes. Let me see him. Let him tell me this to my face that he wrote this.' " McDonald then brought him and Green together. There is nothing in Hamilton's testimony to suggest that he believed he had been promised that whatever he might say to Green could not, or would not, be used against him. To the contrary, he berated himself for not being alert to McDonald's stratagem. Thus, he testified, he "should have guess[ed] something" was wrong when McDonald told him he wasn't " 'supposed' " to let him talk to Green.

Green's testimony is similarly devoid of any suggestion of a promise that his talk with Hamilton would be private and confidential. The substance of his whole testimony is summed up in the following excerpt:

"I was waitin' downstairs and Hamilton went upstairs. And then later on they sent for me to come upstairs and I went into his office and he [McDonald] met me at the top of the stairs and he said, 'Do you want to talk to Hamilton?' I said, 'No.' And so he said, 'You sure?' And I said, 'Okay.' And so we went down the hall and he took us into this little room."

His suspicion of McDonald's conduct went further than Hamilton's. He testified in the out-of-court hearing that when he entered the room he "told Hamilton right off that something was wrong."

A police station is not a home, an office, a private place of business, or other area of personal activity which can properly be expected to be immune from electronic eavesdropping. In the absence of some "special relationship," which the law has "endowed with particularized confidentiality," official surveillance of conversations of persons at a police station is permissible. Lanza v New York, 370 US 139, 143, 144, 8 L ed 2d 384, 82 S Ct 1218 (1962). See also People v Ketchel, 59 Cal 2d 503, 381 P2d 394 (1963). Unlike the cases relied upon by the majority, there is here no representation by competent authority of the confidentiality of the conversation. The record of trial does not show police assurance of the privacy of the conversation between the two accused, but rather a mistaken assumption by the accused that no one could eavesdrop on their talk because the door of the room was closed.

All Hamilton testified to was that he did not know the room was "bugged"; and Green stated that McDonald did not tell him the room was bugged. The majority correctly observe that at one point in his testimony, McDonald indicated he tried to lead the accused to believe they would not be overheard. The statement was made in response to a question by defense counsel as follows:

"Q. To the best of your knowledge, did you lead them to believe that they would not be overheard?
"A. Yes, sir."

What McDonald meant is explained by his further testimony that he merely did not inform either of the accused of the presence of an electronic

listening device in the room. That accords with the testimony of both accused. Rather than claim reliance on promised secrecy of conversation, Green admitted he suspected something was "wrong" in the arrangements. As to Hamilton, he wanted only to challenge Green on the confession he had purportedly made. Nothing in his account of the incident shows even a desire for a private conversation with Green, much less one assured to be confidential. In my opinion, their testimony negates any conclusion they believed no harm would result, from whatever they might say to each other in the closed room, because they were assured of privacy of conversation by McDonald.

The situation is exactly the same as if the two accused had sat together in the public room of the police station or on a park bench and discussed the offenses, in the belief that their whispered conversation could not be overheard. That the conversation is, in fact, overheard does not make their incriminating remarks inadmissible in evidence. I would, therefore, sustain the ruling of the law officer admitting the pretrial statements of the accused into evidence; and I would affirm the decision of the board of review.